**FILED**
**CLERK**

10:39 am, Jul 08, 2019

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
MARC W. WEINSTEIN,

                 Plaintiff,

       -against-

THOMAS C. KRUMPTER, Acting Police
Commissioner, Nassau County, New York,
STEVEN E. SKRYNECKI, Chief of Department,
Nassau County Police Department, DANIEL P.
FLANAGAN, Commanding Officer, First
Precinct, Nassau County Police Department,
JAMES B. MALONE, Police Officer, First
Precinct, Nassau County Police Department,
JOHN DOES I-IV, Police Officers, First Precinct,
Nassau County Police Department, PAUL
CAPPY, Police Officer and Investigator, Nassau
County Police Department, Pistol License
Section, NASSAU COUNTY POLICE
DEPARTMENT, and COUNTY OF NASSAU,

                 Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
2:14-cv-7210 (ADS)(AKT)

**<u>APPEARANCES:</u>**

**The Law Office of Robert T. Bean**
*Counsel for the Plaintiff*
3033 Brighton Third Street
Brooklyn, NY 11235
      By:  Robert T. Bean, Esq., Of Counsel

**Nassau County Attorney**
*Counsel for the Defendants*
One West Street
Mineola, NY 11501
      By:  Ralph J. Reissman, Esq., Deputy County Attorney

**SPATT, District Judge.**

In this case, Marc W. Weinstein ("Weinstein" or the "Plaintiff") challenges the constitutionality of the Nassau County Police Department's (the "Department" or "NCPD") policy of confiscating firearms in the course of responding to domestic incidents. On December 10, 2014, the Plaintiff commenced this action against the Department, Acting NCPD Commissioner Thomas Krumpter ("Krumpter"), NCPD Chief Steven E. Skrynecki ("Skrynecki"), NCPD First Precinct Commanding Officer Daniel P. Flanagan ("Flanagan"), NCPD Officer James B. Malone ("Malone"), and NCPD Officer and Investigator Paul Cappy ("Cappy"). Weinstein originally asserted deprivations of his First, Second, Fourth, Fifth and Fourteenth Amendment rights as well as various state law causes of action. On January 8, 2015, the Plaintiff filed an amended complaint, which added the County of Nassau (the "County") (along with the Department, Krumpter, Skrynecki, Flanagan, Malone, and Cappy collectively referred to as the "Defendants") as a defendant.

On February 25, 2015, the Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P." or "Rule") 65 seeking a preliminary injunction. On April 11, 2015, Weinstein filed a second amended complaint. This Court denied the Plaintiff's motion seeking a preliminary injunction on August 17, 2015, because Weinstein failed to identify any actual and imminent harm that he would suffer if an injunction did not issue.

On September 7, 2017, the Plaintiff filed one of the instant motions, pursuant to FED. R. CIV. P. 56, seeking summary judgment in his favor. The other instant motion, filed on March 8, 2018 by the Defendants, seeks summary judgment pursuant to FED. R. CIV. P. 56 in their favor. In the Plaintiff's memorandum opposing the Defendants' cross-motion, Weinstein withdrew his First Amendment cause of action.

2

On March 1, 2019, this Court ordered that the parties file all Local Rule 56.1 statements and counter-statements with the Court and that each party submit supplemental briefing that addresses whether Nassau County's policy (1) complies with this Court's ruling in *Razzano v. Cty. of Nassau*, 765 F. Supp. 2d 176 (E.D.N.Y. 2011) (Spatt, J.); (2) complies with the Second Circuit's decision in *Panzella v. Sposato*, 863 F.3d 210 (2d Cir. 2017); and (3) satisfies the test set forth in *Mathews v. Eldridge*, 424 U.S. 334, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) as applied in this Circuit. On April 3, 2019, the instant motions were fully briefed.

## I. BACKGROUND

Unless otherwise noted, the following facts are undisputed and are drawn from the parties' Local Rule 56.1 statements.

### A. THE FACTUAL BACKGROUND

#### 1. The Incident

On February 25, 2014, Weinstein was at his residence, located at 781 Jefferson Street, Baldwin, New York. The Plaintiff's wife, Zoila Watson-Weinstein ("Zoila") and his 24-year-old son, Abraham Weinstein ("Abraham"), also resided at the home. Weinstein had previously obtained a license to own handguns from the NCPD and at that time owned nine handguns, all of which were located in his residence. The Plaintiff also owned 39 longarms, which he stored in a safe in the living room.

At approximately 1:30 p.m. that day, the Plaintiff got into a verbal argument with Abraham regarding the use of a washing machine in the basement. Weinstein was upset that Abraham overloaded the washing machine, which caused flooding on the basement floor. Abraham and Weinstein became engaged in a loud verbal dispute, which awoke Zoila in her bedroom. According to Zoila, "They were getting loud. And then I remember hearing something about, you

just wait right here, wait right here. I'll get something for you. And then [Weinstein] ran upstairs.

… He went up to our bedroom. … Then he rushed by me and went back downstairs. But I thought I saw a gun or – I said – it wasn't even that I saw a gun. I thought I saw something brown in his hands. … I know the two of them were still discussing loudly whatever the situation was[.]" Document Entry ("Dkt.") 73-5 at 65:19-67:12.

At 1:33 p.m. Zoila called 911. The following conversation ensued:

OPERATOR: "Nassau County Police 546."

ZOILA: "Hi, I'm calling – I – I – I have somebody that's just really out of control today, and it's my husband. And he even took out a gun to turn around and threaten us in the house. So I think I want to have the police come.

OPERATOR: "Okay, okay, he's not violent right now?"

ZOILA: "No, he's just yelling right now. But he took a gun out to go and –."

OPERATOR: "Took what kind of gun out?" [Zoila hangs up]

*Id*. at 88:16-89:18.

Malone, a NCPD detective, received an emergency radio dispatch at 1:41 p.m. while in his patrol vehicle to respond to a domestic incident "with a hysterical female caller, stating there was a male with a gun – being threatened with a gun[.]" Dkt. 73-7 at 8:14-9:24. When Malone arrived at the house, he knocked on the front door and rang the doorbell. Abraham cracked the door open and told Malone that "everything's fine." Malone responded that he needed to see what occurred and Abraham ultimately let him into the house. Upon entering, Malone observed Zoila standing on the second floor "hysterically crying, tears running down her face." *Id*. at 13:23-14:11. Malone discovered Weinstein in the basement sitting on the couch. The Plaintiff told Malone that although there was a fight, everything was fine. Malone reported that Weinstein looked "very lethargic, very calm, and kind of had like a thousand-yard stare, like looking through me." *Id*. at 14:17-23.

While walking through the house, Malone observed guns and ammunition both inside the living room gun safe, and in various other locations. When Malone spoke to Zoila, she confirmed the 911 call but denied that Weinstein used a gun in the course of the argument.

After interviewing Weinstein, Zoila and Abraham, Malone determined, based on his interpretation of NCPD policy, that the event in question qualified as a "domestic incident." Malone testified:

> They were upset. They lied about a couple of things telling me there was no argument, there was no fight, yet the 911 call said there was a gun. They were very upset. The mother was hysterical, the son was shaking, sweating. Something happened in that house. To this day I fully believe that there was a gun used in the house. Nobody would admit it. They wouldn't say anything about it. They denied it the entire time. I end[ed] up telling Marc, I said you're not being arrested. But we both know something happened in this house.

*Id*. at 28:23-30:7. The NCPD confiscated all 39 longarms, nine handguns and the Plaintiff's handgun license. The parties dispute whether the seizure was voluntary. The NCPD did not obtain a search warrant at any time during its investigation of the incident.

### 2. Applicable Laws & Regulations

A "firearm" includes (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length. N.Y. Penal Law § 265.00(3). A rifle is a "weapon designated or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger." N.Y. Penal Law § 265.00(11). A shotgun is a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed

shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger." N.Y. Penal Law § 265.00(12). Rifles and shotguns are commonly referred to as longarms. The policy at issue is Police Department Procedure OPS 10023, entitled "Removal and Dispositions of Weapons – Domestic Incidents / Threats to Public Safety ("OPS 10023" or the "Policy"). The Policy establishes a framework for removing firearms, rifles, and shotguns and details the following procedure:

1. *Confiscates* illegally possessed firearms, rifles, and shotguns *and*

a. if present, *arrests* the offender, ...

b. *processes* the evidence.

2. *Confiscates* pistol licenses and licensed firearms when the licensee is:

a. arrested,

b. the subject of an order of protection,

c. involved in physical violence or the threat of violence.

* * *

3. *Confiscates* legally possessed firearms, rifles and shotguns when such firearms, rifles and shotguns create a threat of violence or threat to the public safety.

4. *Accepts* legally possessed firearms, rifles, and shotguns that are voluntarily surrendered by persons.

5. *Renders* firearms, rifles, and shotguns safe.

6. *Prepares* PDCN Form 41, Property Receipt, *and*

a. gives a copy to the owner,

b. *forwards* a copy to the Precinct Domestic Incident Liaison Officer,

7. *Invoices* the confiscated property.

Dkt. 73-11 (emphasis in original). OPS 10023 also explains the framework that governs "returning, retaining or destroying the firearms, rifles, and shotguns after completion of an investigative review." The Precinct Domestic Incident Liaison Officer must do the following:

1. *Reviews* all incidents involving confiscation of rifles and shotguns as soon as possible,

2. *Determines* if the confiscation of rifles and shotguns was appropriate.

3. *Ensures* the immediate return of confiscated rifles and shotguns in the following situations:

a. confiscation was inappropriate,

b. new information is learned which makes the confiscation inappropriate.

4. *Initiates* an administrative review to determine if a legal impediment exists not to return confiscated rifles and shotguns,

5. *Mails* the following forms, return receipt requested, to the owner of the rifles and shotguns:

a. PDCN Form 173, Long Gun Review Record, and

b. Long Gun Cover Letter.

6. *Forwards mandatory* information to the Desk Personnel and *directs* them to request a National Crime Information Computer (NCIC) inquiry, using the QICS format, to determine if there is any information that would prohibit a return of firearms, rifles, and shotguns under the Federal Gun Control Act [18 U.S.C. § 922] ...

* * *

12. *Determines* if any of the following conditions exist:

a. the owner is prohibited from possessing rifles or shotguns under the Federal Gun Control Act,

b. the owner has a relevant pending court disposition,

c. the owner is a subject of an order of protection,

d. the owner has a relevant Nassau County arrest history,

e. domestic incidents have occurred since the time of the confiscation or voluntary surrender,

f. other extenuating circumstances which indicate that rifles and shotguns should not be returned.

13. *Interviews* the investigating detective, if the Detective Division was involved in the initial incident.

14. *Interviews* the victim of a domestic incident, outside the presence of the offender, to determine the following:

a. current status of the relationship,

b. if there have been any threats since the initial incident,

c. whether the victim believes that the rifles and shotguns can be safely returned,

d. any other circumstances relevant to the return of the rifles and shotguns.

15. *Reviews* the gathered information to determine if the rifles and shotguns should continue to be held or be returned.

16. If notified by a Pistol License Section Supervisor that the owners [sic] license has been reinstated:

a. *prepares* a brief narrative report outlining the investigation, indicating that Pistol License Section has concluded a pistol license investigation and is reinstating the owner[']s license, and

b. *forwards* the following to the Patrol Division Domestic Incident Coordinator:

(1) narrative report,

(2) copy of internal correspondence received from Pistol License Section regarding the reinstatement of pistol license. ...

17. *Prepares* a brief narrative report outlining the investigation, including a recommendation as to whether the rifles and shotguns should be returned.

18. *Prepares* the following forms, if the rifles and shotguns will be returned:

a. PDCN Form 83, and

b. PDCN Form 110, Property Bureau Notice to Claimant Card.

19. *Forwards* the following to the Patrol Division Domestic Incident Coordinator:

a. narrative report,

b. PDCN Form 83, if prepared,

c. PDCN Form 100, if prepared.

* * *

23. If the shotguns and rifles *will not* be returned, *notifies* Legal Bureau to initiate legal proceedings.

24. *Notifies* the following regarding the status of the rifles and shotguns:

a. victim, if one exists,

b. owner, only if rifles and shotguns will be returned.

25. *Notifies* PB to destroy firearms, rifles and shotguns in the following situations:

a. owner [cannot] be located,

b. owner does not want rifles and shotguns returned,

c. an investigation reveals a legal impediment still exists not to return the rifles and shotguns.

*Id*. (emphasis in original).

Although no license is required to possess longarms in Nassau County, to own a pistol or revolver, which are commonly referred to as handguns, an individual must have a valid handgun license. All residents of the County who seek to acquire a handgun license must file an application to the Nassau County Police Commissioner, the licensing officer for the County. Handgun licenses expire five years after issuance unless renewed. They also "may be revoked and cancelled at any time[.]" N.Y. Penal Law § 400.00(11). NCPD's Pistol License Section has the authority to issue, deny, limit, suspend, or revoke handgun licenses. At the time of the incident, a handgun license was subject to a mandatory six-month suspension if its owner was involved in a domestic incident. All handguns would also be removed from the home along with the license. On May 21, 2015, the Nassau County Pistol License Information Handbook was revised to state the following:

The policy of the Nassau County Police Department is to take a proactive stance against domestic violence, specifically to protect victims of domestic violence, enforce laws and prevent future violence. Therefore, upon notification of any domestic situation where violence is threatened or alleged to have occurred or upon notification of the existence of a volatile domestic situation, the Nassau County Police Department will require the surrender of the pistol license and firearm(s*) as well as rifles and shotguns* of any involved licensee pending an investigation into the facts and circumstances of the domestic incident and ongoing domestic relations of the licensee and any other involved party(ies). Nassau County Police Department policy requires an investigation before reinstatement of the pistol license can be authorized. The license and firearm(s) as well as any rifles and shotguns will be returned only after a thorough investigation reveals that there are no compelling reasons for continuing the suspension.

Dkt. 73-12 (emphasis in original).

### 3. Firearm Retrieval Process

When handguns and handgun licenses are confiscated, they are transported to the closest precinct and assigned to a police officer in the Pistol License Section, who conducts an investigation into whether the handguns and license should be returned. If longarms are involved, the Deputy Commanding Officer is designated as the Precinct Domestic Incident Liaison Officer and initiates an investigation into whether longarms should be returned. As noted above, Weinstein's firearms and handgun license were confiscated on February 25, 2014. The Plaintiff's handguns and handgun license were transported to the First Precinct and assigned to Cappy. His longarms were also transported to the First Precinct, where Deputy Inspector Robert Musetich ("Musetich") was the Deputy Commanding Officer.

### a. Handguns

On January 28, 2015, Marc Timpano, the Commanding Officer of the Pistol License Section, recommended that Weinstein's handgun license be reinstated and that his handguns be returned to him. On February 6, 2015, Weinstein arrived at the NCPD's Police Headquarters and retrieved all of his handguns.

### b. Longarms

On March 3, 2014, Musetich mailed a letter to Weinstein that asked the Plaintiff to complete a Long Gun Review Record form and return it to the NCPD. Although the Plaintiff denies having received this letter or the enclosed forms, Weinstein wrote Musetich a letter that same day to request the return of his firearms and license. The Plaintiff did not attach a Long Gun Review Record to this letter. The NCPD was unable to continue to process Weinstein's request for the return of his longarms without the Long Gun Review Record.

In October 2014, NCPD Captain John Gisondi ("Gisondi") became the Deputy Commanding Officer and Precinct Domestic Incident Liaison Officer for the First Precinct. Gisondi directed his staff to review files on confiscations and re-send letters for those who still had not had their firearms returned. On January 15, 2015, Gisondi sent a certified letter to the Plaintiff again requesting that he complete the enclosed Long Gun Review Record form. By then, Weinstein had already filed the instant lawsuit. The Plaintiff's attorney responded to Gisondi by letter on January 27, 2015 and enclosed a completed Long Gun Review Record.

Upon receipt of the Long Gun Review Record, Gisondi sent the Plaintiff a letter on February 6, 2015 that informed Weinstein of additional paperwork that had to be completed. Gisondi attached the form letters that needed to be filled out, signed, and notarized by all those who reside with the Plaintiff. The form letters stated that the signing party had no objection to the return of the firearms, did not feel threatened by Weinstein, and did not believe that he/she would be endangered if the firearms were returned. Zoila, Abraham and the Plaintiff's daughter, who was not at the residence on the date of the incident, signed and notarized the forms. On or around that time, the NCPD completed a Domestic Gun Return Checklist that confirmed all required steps had been completed. Gisondi also personally interviewed all three family members who lived with

Weinstein. On February 25, 2015, Gisondi wrote a memorandum to the Patrol Division Domestic Incident Coordinator recommending that Weinstein's longarms be returned.

On March 13, 2015, Weinstein arrived at the NCPD's First Precinct and retrieved all 39 longarms.

## II. DISCUSSION

### A. STANDARD OF REVIEW: FED. R. CIV. P. 56

Pursuant to Rule 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015); *Kwong v. Bloomberg*, 723 F.3d 160, 164-65 (2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). When deciding a motion for summary judgment, "[t]he Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non–moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In considering a summary judgment motion pursuant to Rule 56, the Court must "view the evidence in the light most favorable to the non-moving party … and may grant summary judgment only when 'no reasonable trier of fact could find in favor of the nonmoving party.'" *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations omitted); *see also Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007) (noting that in deciding a summary judgment motion, the court will "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all inferences and resolv[e] all ambiguities in favor of the nonmoving

party"); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (stating that in deciding a Rule 56 motion, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." (internal citations omitted)).

It is the movant's burden to initially demonstrate the absence of material facts that preclude summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005) (citing *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994)). Such a "burden on the moving party may be discharged by 'showing' … that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. CocaCola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). If the moving party meets the initial burden, the nonmoving party must present specific facts that demonstrate there is a genuine issue that should be left for the fact-finder to decide. *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002); *see also Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (requiring the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts … the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" (internal citations omitted)).

It is not the Court's responsibility to resolve any purported issues of disputed facts, but merely to "assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986) (internal citations omitted); *accord Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012) (stating that the Court should not attempt to resolve issues of

fact, but rather "assess whether there are any factual issues to be tried"); *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (noting that the responsibility of the district court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" (quoting *Anderson*, 477 U.S. at 249)). If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not present. *Anderson*, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient. Conjecture, speculation, or conclusory statements are not enough to defeat summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citations omitted).

## B. SECOND AMENDMENT CLAIM

Both Weinstein and the Defendants move for summary judgment on his Section 1983 cause of action for the purported violation of his Second Amendment rights. The Plaintiff contends that the confiscation of his firearms infringes on his right to bear arms.

The Second Amendment provides that: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In 2008, the Supreme Court ruled that the Second Amendment "codified a pre-existing right" that contains an "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). Two years later, in *McDonald v. Chicago*, the Supreme Court held that the Second Amendment applies to the states via the Fourteenth Amendment. 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). Yet, the Second Amendment does not allow individuals "to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

In the Second Circuit, "the 'right to bear arms' is not a right to hold some particular gun."

*Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 429 (S.D.N.Y. 2013) (collecting cases). The

Plaintiff does not dispute that, at least regarding the longarms, there is nothing that impacts

Weinstein's ability to acquire additional firearms. Rather, Weinstein contends that the suspension

of his handgun license through Penal Law §§ 265.00 and 400.00 violated the Second Amendment.

This Circuit recently held that:

> the appropriate level of scrutiny under which a court reviews a statute or regulation
> in the Second Amendment context is determined by how substantially that statute
> or regulation burdens the exercise of one's Second Amendment rights. 682 F.3d at
> 164. [The Second Circuit] further explained that where the burden imposed by a
> regulation on firearms is a "marginal, incremental or even appreciable restraint on
> the right to keep and bear arms, it will not be subject to heightened scrutiny. Rather,
> heightened scrutiny is triggered only by those restrictions that (like the complete
> prohibition on handguns struck down in *Heller*) operate as a substantial burden on
> the ability of law-abiding citizens to possess and use a firearm for self-defense (or
> for other lawful purposes).

*Aron v. Becker*, 48 F. Supp. 3d 347, 369-70 (N.D.N.Y. 2014) (quoting *Kwong*, 723 F.3d at 167

(internal citations and quotation marks omitted)).

The Plaintiff challenges Penal Law § 400.00, which is "the exclusive statutory mechanism

for the licensing of firearms in New York State." *O'Connor v. Scarpino*, 83 N.Y.2d 919, 920, 615

N.Y.S.2d 305, 638 N.E.2d 950 (1994). The provision at issue, Penal Law § 400.00(11), instructs

the following:

> (a) The conviction of a licensee anywhere of a felony or serious offense or a
> licensee at any time becoming ineligible to obtain a license under this section shall
> operate as a revocation of the license. A license may be revoked or suspended as
> provided for in section 530.14 of the criminal procedure law or section eight
> hundred forty-two-a of the family court act. Except for a license issued pursuant to
> section 400.01 of this article, a license may be revoked and cancelled at any time
> in the city of New York, and in the counties of Nassau and Suffolk, by the licensing
> officer, and elsewhere than in the city of New York by any judge or justice of a
> court of record; a license issued pursuant to section 400.01 of this article may be
> revoked and cancelled at any time by the licensing officer or any judge or justice

of a court of record. The official revoking a license shall give written notice thereof without unnecessary delay to the executive department, division of state police, Albany, and shall also notify immediately the duly constituted police authorities of the locality.

N.Y. Penal Law § 400.00(11). The licensing officer "is vested with broad discretion in determining whether to issue or revoke a license to possess firearms." *Nash v. Nassau Cty.*, 150 A.D.3d 1120, 1121 52 N.Y.S.3d 670 (2d Dept. 2017). To protect the public, it is his or her responsibility to ensure that only law-abiding individuals are afforded the privilege of possessing a handgun. In the instant case, the Nassau County Police Commissioner is the applicable licensing officer. Adverse decisions may be challenged by license holders in state court. *See Martino v. Nassau Cty. Police Dept.*, 66 A.D.3d 781, 781-82, 887 N.Y.S.2d 204 (2d Dept. 2009).

As this provision does not pose a substantial burden on the Second Amendment to law abiding New Yorkers, the Court will apply intermediate scrutiny to examine whether Penal Law § 400.00(11) is substantially related to the pertinent government interests, and whether there is a reasonable fit between the law and the stated objective. *See Avitabile v. Beach*, 277 F. Supp. 3d 326, 334 (N.D.N.Y. 2017) ("[D]istrict courts in this Circuit have continually chosen to apply 'intermediate scrutiny to general challenges under the Second Amendment, even when reviewing statutes or laws that may restrict the possession of [weapons] in the home.'" (quoting *Maloney v. Singas*, 106 F. Supp. 3d 300, 311 (E.D.N.Y. 2015))). New York State has a legitimate interest in ensuring public safety, preventing crime, and confirming that only law-abiding, responsible individuals possess handguns to defend their person and property. *See Pelose v. Cty. Court of Westchester Cty.*, 384 N.Y.S.2d 499, 500, 53 A.D.2d 645 (2d Dept. 1976) ("[New York] State has a substantial and legitimate interest and indeed, a grave responsibility, in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the

essential temperament or character which should be present in one entrusted with a dangerous instrument.").  In contrast, the Plaintiff contends that a handgun license is a right, not a privilege to be weighed along with the state's countervailing interests.  Weinstein's theory has been directly contradicted by the Second Circuit.  *Boss v. Kelly*, 306 F. App'x 649, 650 (2d Cir. 2009) ("Under New York law, it is well settled that the possession of a handgun license is a privilege, not a right, which is subject to the broad discretion of the New York City Police Commissioner." (quoting *Papaioannou v. Kelly*, 788 N.Y.S.2d 378, 378 (1st Dept. 2005))).

This Court agrees with the district courts in this Circuit that have previously found that there is no constitutional right to a handgun license in New York State.  *See Toussaint v. City of New York*, No. 17-CV-5576, 2018 WL 4288637, at *7 (E.D.N.Y. Sept. 7, 2018) (dismissing case because the plaintiff "cannot show that he has a protected liberty or property interest in a 'possible future [handgun] license'" (quoting *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009))); *Perros v. Cty. of Nassau*, 238 F. Supp. 3d 395, 401 (E.D.N.Y. 2017) ("Under New York law, it is well-settled that the possession of a handgun license is a privilege, not a right." (internal citations omitted)).  The challenged law substantially relates to the pertinent government objective of limiting the possession of handguns to law abiding, responsible individuals and there is a reasonable fit between the objective and the law.  *See Libertarian Party of Erie Cty. v. Cuomo*, 300 F. Supp. 3d 424, 443 (W.D.N.Y. 2018); *Toussaint*, 2018 WL 4288637, at *6; *Aron*, 48 F. Supp. 3d at 334; *Mishtaku v. City of New York*, No. 14-cv-839, 2015 WL 13002182, at *5 (S.D.N.Y. May 4, 2015) (collecting cases).

Accordingly, the conduct alleged by the Plaintiff does not amount to a Second Amendment violation.  Therefore, the Defendants' motion for summary judgment is granted with regard to the Second Amendment claim.

## C. FOURTH AMENDMENT CLAIM

Both the Plaintiff and the Defendants have moved for summary judgement on Weinstein's Section 1983 cause of action for the purported violation of his Fourth Amendment rights. He argues that the NCPD's seizure of his firearms violated his Fourth Amendment right to be free from unreasonable searches and seizures.

The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. "The warrant requirement of the Fourth Amendment guarantees the fundamental right to be free from government intrusion into the privacy of one's home." *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (internal citations omitted); *see also United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) ("A warrantless search is *per se* unreasonable … subject only to a few specifically established and well-delineated exceptions." (internal quotation marks omitted)). Accordingly, "[t]he Fourth Amendment generally prohibits a warrantless entry into an individual's home." *Callahan v. City of New York*, 90 F. Supp. 3d 60, 69 (E.D.N.Y. 2015).

The Plaintiff does not contend that the NCPD's original entry into the residence was unjustified. *See Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998) ("Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had a substantial reason to believe that one of the parties to the dispute was in danger."). Rather, the parties agree that based on the totality of the circumstances and the information available at the time of the incident, Malone could have reasonably believed that entry was required to protect a member of

18

the Weinstein family. Weinstein only asserts that the NCPD improperly seized his firearms without a warrant.

The Plaintiff has no Fourth Amendment claim as to the seizure of his handguns. In his deposition, Weinstein explained that Malone returned to the residence shortly after the initial incident with additional uniform officers and requested that he surrender his firearms. Weinstein consented to the seizure of his handgun license and handguns because "according to the guide and stuff … you have to surrender your pistols once you are told." Dkt. 66-2 at 77:12-18. He then opened up his firearm safe and handed his handguns to Malone. The Plaintiff consented to the seizure of his handgun license and handgun.

Yet, Weinstein did not consent to the seizure of his longarms and the NCPD did not have a warrant to search for or seize them. There are several exceptions to this general rule, which prohibits a warrantless search by the government of one's residence. The Defendants contend that the NCPD was authorized to seize the Plaintiff's longarms based on exigent circumstances. *See Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 236 (E.D.N.Y. 2010) ("A warrantless search is permissible if exigent circumstances require state officials' immediate entry to the property."). To decide whether exigent circumstances existed, "[t]he essential question … is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." *Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002); *see also United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008) (same); *Rogers v. Apicella*, 606 F. Supp. 2d 272, 286 (D. Conn. 2009) (same). In other words, the responding police officers needed "probable cause plus exigent circumstances in order to make a lawful entry" into the residence or seize the Plaintiff's property. *Harris v. O'Hare*, 770 F.3d 224, 231-32 (2d Cir. 2014) (quoting *Kirk v. Louisiana*, 536 U.S. 635, 638, 122 S. Ct. 2458, 153 L. Ed. 2d 599 (2002)).

"The test for determining exigent circumstances is an objective one that turns on the totality of the circumstances confronting law enforcement agents in a particular case." *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 139 (D. Conn. 2004). In this circuit, there are six factors that are considered when determining the existence of exigent circumstances:

> (1) the gravity or violent nature of the offense the suspect allegedly committed; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause that the suspect committed the crime; (4) strong reason to believe the suspect is in the premises being entered; (5) a likelihood the suspect will escape if not swiftly captured; and (6) the peaceful circumstances of the entry.

*Id*. (citing *MacDonald*, 916 F.2d at 769-70). Further, a court may also examine if law enforcement had "a reasonable belief … that the targets of an investigation are armed or that quick actions is necessary to prevent the destruction of evidence." *Id*. These factors are "merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive." *United States v. Medina*, 944 F.2d 60, 68 (2d Cir. 1991). They are meant "as guideposts intended to facilitate the district court's determination." *MacDonald*, 916 F.2d at 769. Even the presence of a single factor may be sufficient to find the existence of exigent circumstances. *Id*. at 770.

When Malone was dispatched to the residence, the emergency dispatcher reported to him that there was a frantic female caller who reported a domestic disturbance that involved a man with a gun. At that point, exigent circumstances justified Malone's entry into the residence, regardless of whether or not Abraham ultimately let him in. After entering the residence, Malone interviewed Weinstein, Zoila, and Abraham. He observed Zoila still visibly hysterical and Weinstein in the basement with a peculiar demeanor. According to Malone, he was "very lethargic, very calm, and kind of had like a thousand-yard stare, like looking through me." During Malone's conversation with Zoila, she confirmed her emergency phone call to police. There were no visible injuries on any of the residents. The record suggests that Malone and his fellow officer

left the residence without making any arrests and then returned with additional officers at a later time. The NCPD then confiscated the Plaintiff's longarms and transported them to the First Precinct. The Court cannot conclude based on the current record that exigent circumstances existed at the time the confiscation occurred. By the time the officers returned to the residence, it cannot be said that the officers had an "'urgent need' to render aid or take action" as a matter of law. *Loria*, 306 F.3d at 1284. It is not clear when the officers left the residence and when they returned. The parties dispute the manner in which Malone seized the longarms, whether consent was given, and whether any possible consent provided was done so while potentially under duress. These disputed issues of fact preclude summary judgment as to the seizure of the Plaintiff's longarms.

Accordingly, the Plaintiff may proceed on his Fourth Amendment claim as it pertains to the seizure of Weinstein's longarms. The remainder of the claim is hereby dismissed.

## D. DUE PROCESS CLAIMS

Both parties move for summary judgment regarding the Plaintiff's procedural due process claim pursuant to the Fifth and Fourteenth Amendments. Unlike the Fourth Amendment claim, this cause of action only addresses the process afforded to the Plaintiff after his firearms were confiscated; it does not address the legality of the seizure.

The Fifth Amendment instructs that "No person shall … be deprived of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. V. As with the remainder of the Bill of Rights, the Fifth Amendment is applicable to the states through the Fourteenth Amendment, which explicitly prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and

(2) deprivation of that interest without due process." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

As a preliminary matter, the Plaintiff's due process claim regarding his handgun license and handguns does not state a claim. "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005). As discussed *supra*, there is no protectible interest in a New York State-issued handgun license, which is subject to the broad discretion of the licensing official. *See Boss* 306 F. App'x at 650 ("Under New York law, it is well settled that the possession of a handgun license is a privilege, not a right, which is subject to the broad discretion of the New York City Police Commissioner." (quoting *Papaioannou*, 788 N.Y.S.2d at 378)); *Moore v. City of New York*, No. 15-cv-6600, 2018 WL 3491286, at *22-23 (S.D.N.Y. July 20, 2018) (same). Without a protectible interest, the Plaintiff cannot state a procedural due process claim. Accordingly, Weinstein's procedural due process claim as it relates to his handgun license or handguns is dismissed.

The Plaintiff also asserts that OPS 10023 did not afford him sufficient due process after the seizure of his longarms. To advance this argument, Weinstein relies on this Court's decision in *Razzano v. Cty. of Nassau*, 765 F. Supp. 2d 176 (E.D.N.Y. 2011) (Spatt, J.), which held that the previous NCPD policy regarding firearms provided inadequate post-deprivation process to the plaintiff. In *Razzano*, the Court described the applicable legal standards of the Fourteenth Amendment due process clause:

> In evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees. Where, as here, a plaintiff alleges a deprivation pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation

hearing. Although the County points out that it apprised the Plaintiff of his post-deprivation remedies, in such instances, the availability of post-deprivation procedures will not, ipso facto, satisfy due process. Instead, courts must look to the three-part test articulated by the Supreme Court in *Mathews v. Eldridge*, to determine what level of process is due under the circumstances.

Under the *Mathews* test, courts weigh: (1) the private interest affected by the state action; (2) the risk of erroneous deprivation through the procedures used and the value of additional procedural safeguards; and (3) the government's interest in taking the challenged action.

765 F. Supp. 2d at 185 (internal citations, quotation marks, and alterations omitted).

The parties agree that the Plaintiff has a private interest in possessing longarms and that the confiscation of his longarms was pursuant to an established state procedure. Thus, this factor favors Weinstein. To apply the second prong, the Court must consider "the risk of an erroneous deprivation of such interest through the procedures used, and the value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. As the Defendants describe, OPS 10023 contains the following procedural safeguards: (1) initiating of investigation by the Precinct Domestic Incident Liaison Coordinator; (2) require the owner to fill out Form 173; (3) initiation of an administrative review; (4) review the National Crime Information database to determine if there is anything that would permit a return of rifles under the Federal Gun Control Act; and (5) interviews with other parties or victims to obtain consent.

The Plaintiff contends that the above procedures failed to provide a meaningful opportunity to be heard in a timely and sufficient manner. To advance this argument, Weinstein asserts that the current procedure for returning longarms, OPS 10023, does not meet the four requirements elucidated in *Razzano*. To review, *Razzano* required the County to initiate a prompt post-deprivation hearing that adhered to the following requirements:

First, the post-deprivation hearing must be held before a neutral decision-maker.

Second, … the right to a prompt post-deprivation hearing only applies to seized longarms that are not (1) the fruit of a crime, (2) an instrument of crime, (3) evidence of a crime, (4) contraband, or (5) barred by court order from being possessed by the person from whom they were confiscated.

Third, at the hearing, Nassau County shall have the burden of showing that it is likely to succeed in court on a cause of action—presumably forfeiture or a cause of action seeking an order of protection, although the Court does not limit Nassau County to these theories—to maintain possession of the seized longarms.

Fourth, if the person deprived of longarms prevails at the hearing, the longarms must be returned, barring an order to the contrary from a court to whom that finding is appealed. If, by contrast, Nassau County prevails at the hearing, Nassau County must timely commence a proceeding by which it seeks to maintain possession of the longarms in question.

*Razzano*, 765 F. Supp. 2d at 191. This remedy provides substantial protections to individuals whose longarms are seized at a relatively small cost to the County. The Defendants have not presented any evidence that a *Razzano* hearing would be overly costly or burdensome. As this Court explained, there is nothing preventing the County from having a single hearing officer review handgun licenses and longarms seizures.

The Defendants argue that the current procedure satisfies both *Matthews'* second prong and *Razzano* by providing a "prompt and thorough investigation … immediately after confiscation," Dkt. 79 at 7, and returning longarms after completion of the investigation, if warranted. The Court agrees, as a general matter, that OPS 10023 establishes a thorough procedure that ensures longarms are only returned to law abiding, responsible individuals. However, the effectiveness or scrupulousness of a procedure does not render it compliant with procedural due process. Notably, OPS 10023 does not provide a *prompt, post-deprivation hearing* to determine if longarms are being erroneously held by the NCPD. In executing its responsibility to protect the public, it remains possible that police officers may make a mistake in the course of the multitude

of stressful decisions required while on duty. A prompt hearing would be valuable in correcting these mistakes and preventing erroneous deprivation.

While the scrupulousness of the procedure ensures the correct result, the lack of a prompt hearing leaves room for a heightened risk of prolonged deprivation for undeserving owners of longarms. Notably, the current procedure does not provide swift relief. In the instant case, Weinstein's firearms were seized on February 25, 2014. On March 3, 2014, Musetich mailed a Long Gun Review Record form to the Plaintiff and requested that he fill it out and return it to the NCPD. Weinstein did not respond to this request until January 2015, after a new request by the NCPD was initiated to retrieve the Long Gun Review Record form. On February 25, 2015, Gisondi recommended that Weinstein's longarms be returned. On March 13, 2015, Weinstein retrieved all 39 longarms from the NCPD. Discounting the period of time whereby the Plaintiff failed to respond to the NCPD's request, the process took approximately two to three months.

Although this is not an unreasonable length of time to complete an investigation and return property, the record reflects that Weinstein's experience is not typical. In the First Precinct alone, the NCPD only returned confiscated longarms for two of the 23 individuals who had their weapons seized between September 2012 and February 2014. For many of these individuals, their longarms remain confiscated after *four years*. This is unacceptable. While all 23 individuals should not or will not have their weapons returned for various reasons, and that many of these delays may not be due to the NCPD, the Court can safely assume that a plurality of these seizures will ultimately result in longarms being returned to their owners.

Further, for many owners the investigation is on hold for the failure of a victim to return his or her contact forms. For others, it is held up for failure to return a Long Gun Review Record form. This cannot indefinitely preclude individuals from receiving a timely decision in the

investigative process.  Owners of longarms are entitled to a *prompt* investigation to determine if their property has been erroneously seized from them.  Thoroughness of process is not sufficient to overcome the potential for erroneous deprivation; a timely process is required to satisfy constitutional muster.  As the Second Circuit explained in *Panzella*, "a lengthy deprivation can be enough to violate the Fourteenth Amendment right to due process."  863 F.3d at 218 n.9.  For those who have had their longarms seized, four years is much too long to wait for an adjudication of that process.  The Court concludes that the current process raises a considerable risk of erroneous deprivation.

The third *Mathews* factor inquires as to "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. at 335.  The argument presented by the Defendants in support of this factor mimics part of the argument advanced by the County in *Razzano*, that although the lack of license requirement allows individuals to replace confiscated longarms with newly purchased ones, the government has a critical interest in keeping guns away from dangerous individuals.  As the Court previously explained in *Razzano*, a person's ability to purchase additional longarms to replace the weapons seized substantially limits the Defendants public safety interest in retaining confiscated longarms.  *See Panzella*, 863 F.3d at 219 (holding that the plaintiff's ability to freely purchase additional longarms precludes the Court from relying on any public safety interest); *Razzano*, 765 F. Supp. 2d at 189 ("[O]nce a person whose longarms are taken has the opportunity to legally obtain and possess new longarms, the retention of that individual's old longarms does not greatly protect the public from potential harm.  It follows that the state's interest in retaining those longarms is similarly diminished.").

Having weighed the three *Mathews* factors, the Court finds that persons whose longarms are seized by the County are entitled to a prompt pre-deprivation hearing that is consistent with *Razzano*. *See Panzella*, 863 F.3d at 219 ("We therefore hold, consistent with the district court's decision in the instant case, and the decision in *Razzano*, that persons in [the plaintiff]'s situation are entitled to a prompt post-deprivation hearing under the four conditions set forth by the district court in this case and in *Razzano*."). Accordingly, the Plaintiff's Fourteenth Amendment due process rights were violated. The Court respectfully refers this case to United States Magistrate Judge A. Kathleen Tomlinson for an inquest into any potential damages.

**E. MONELL CLAIMS**

The Plaintiff argues that the individuals involved in the seizure of his firearms were acting pursuant to an official policy of the County and the NCPD in asserting a *Monell* claim against the County. To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 563 U.S. 51, 60, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011)); *see also Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 611 (1978) ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels").

The Defendants assert that Weinstein cannot state a *Monell* claim against the County because OPS 10023 does provide constitutionally sufficient procedural due process. As discussed *supra*, OPS 10023 violates the Fourteenth Amendment for failure to afford the requisite procedural due process protections. The Defendants' argument is now moot.

27

Accordingly, this Court denies the Defendants' cross-motion for summary judgment as it pertains to Weinstein's *Monell* claim.

## III.  CONCLUSION

For the reasons set forth above, the Plaintiff's motion for summary judgment is granted with respect to his Fourteenth Amendment procedural due process claim; the remainder of the motion is denied.  Further, the Defendants' motion for summary judgment is granted with respect to the Plaintiff's Second Amendment claim and part of his Fourth Amendment and procedural due process claims; the remainder of the motion is denied.

The Court respectfully refers this case to United States Magistrate Judge A. Kathleen Tomlinson for an inquest into any potential damages stemming from the Plaintiff's Fourteenth Amendment Claim.

**SO ORDERED**

Dated: Central Islip, New York
July 8, 2019

____*/s/ Arthur D. Spatt*_____
ARTHUR D. SPATT
United States District Judge
